Case 3:02-at-06000   Document 48   Filed 01/11/18   Page 1 of 29

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| James Hunt, | : | |
| | : | |
| Plaintiff | : | |
| | : | Civil Action No. _____ |
| | : | |
| v. | : | |
| | : | |
| Jason Seeba, Lieutenant, USP | : | |
| Lewisburg; David J. Ebbert, Warden, | : | |
| USP Lewisburg; John Doe 1, Lieutenant, | : | |
| USP Lewisburg; John Doe 2, Captain, | : | *Electronically Filed* |
| USP Lewisburg; John Doe 3, Operations | : | |
| Lieutenant, USP Lewisburg; and, | : | |
| United States of America | : | |
| | : | |
| Defendants. | : | |
| | : | |

**COMPLAINT**

## I.  PRELIMINARY STATEMENT

1.  This is an action asserting constitutional claims under <u>Bivens v. Six Unknown</u>

<u>Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971), and tort claims

1

under the Federal Tort Claims Act (FTCA) arising from an incident in the Special

Management Unit ("SMU") at USP Lewisburg.  During that incident, USP

Lewisburg staff members used a pepper ball gun and grenade weapon on Plaintiff

James Hunt ("Mr. Hunt") while he was inside his locked cell.  There was no need

for this use of force on Mr. Hunt.  Mr. Hunt suffered serious and permanent

injuries as a result of this incident, including the loss of his right eye.

## II. JURISDICTION AND VENUE

2.  This Court has jurisdiction over the subject matter of this Complaint under the

United States Constitution and under 28 U.S.C. §§ 1331, 1343, 1346(b), and

2671, et seq.

3.  Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1402(b) as the

actions at issue in this matter occurred in Lewisburg, Pennsylvania, which is

located within the Middle District of Pennsylvania.

4.  Mr. Hunt has exhausted his federal tort claim administrative remedies and

received a final denial of his Administrative Tort Claim from the Federal Bureau

of Prisons' Northeast Regional Office dated December 22, 2017.

## III. PARTIES

5.  Plaintiff James Hunt is a citizen of the United States.  At all times relevant to this

Complaint, Mr. Hunt was incarcerated in the SMU at USP Lewisburg in

Lewisburg, PA.  He is no longer incarcerated.

6. Defendant United States of America is the appropriate defendant under the Federal Tort Claims Act.

7. Defendant Jason Seeba was, at all times relevant to this Complaint, employed by the federal Bureau of Prisons (BOP) as a Lieutenant at USP Lewisburg. He is sued in his individual capacity.

8. Defendant David J. Ebbert was, at all times relevant to this Complaint, employed by the BOP as the Warden of USP Lewisburg. He is sued in his individual and official capacities.

9. Defendant John Doe 1[1] was, at all times relevant to this Complaint, employed by the BOP as a Lieutenant at USP Lewisburg. He is sued in his individual capacity.

10. Defendant John Doe 2 was, at all times relevant to this Complaint, employed by the BOP as a Captain at USP Lewisburg. He is sued in his individual and official capacities.

11. Defendant John Doe 3 was, at all times relevant to this Complaint, employed by the BOP as an Operations Lieutenant at USP Lewisburg. He is being sued in his individual and official capacities.

12. At all times relevant to this Complaint, Defendants Seeba, Ebbert, Doe 1, Doe 2, and Doe 3 were acting within the course and scope of their employment with the

---

[1] Plaintiff does not currently know the identities of John Does 1, 2, and 3. Plaintiff plans to conduct preliminary discovery to learn the identities of these defendants, after which he will file an Amended Complaint which substitutes their true names for these "Doe" placeholders.

BOP and were acting as investigative and/ or law enforcement officers.

13.  At all times relevant to this Complaint, all defendants acted in concert and

conspiracy and were jointly and severally responsible for the harms caused to Mr.

Hunt.

## IV.    FACTS

14.  USP Lewisburg is a high-security federal penitentiary.

15.  The SMU program at USP Lewisburg is described in BOP materials as being

designed for prisoners who are the most disruptive in the federal prison system.

16.  All inmate movement in the SMU is controlled by correctional staff.

17.  The doors to cells in the SMU remain closed and locked at all times, except

when an inmate is being escorted into or out of the cell by staff.

18.  SMU prisoners are supposed to get one hour per day of out-of-cell recreation

five days per week.

19.  On January 14, 2016, Mr. Hunt was housed with his cellmate in "X Block" in

cell X-102.

20.  Mr. Hunt had been having problems with his cellmate for several weeks prior to

that, stemming from his cellmate getting into arguments with correctional officers.

21.  After those disputes, staff members retaliated by refusing to permit the cellmate

to have his one hour per day of out-of-cell recreation.

22.  Although Mr. Hunt had no problems with staff  himself, they denied him

4

recreation too, on account of his cellmate's behavior.

23. On the morning of January 14, 2016, Correctional Officer J. Murray noticed a piece of paper covering the window of cell X-102.

24. This is a violation of SMU rules, as cell windows are supposed to be free from coverings at all times.

25. Correctional Officers and Lieutenants, including Defendants Seeba and John Doe 1, came to the cell door in response to a call for assistance made by Officer Murray.

26. As correctional staff gathered outside the cell, Mr. Hunt was sitting on the lower bunk inside the locked cell.

27. Mr. Hunt's cellmate was on the upper bunk.

28. Mr. Hunt and his cellmate were simply sitting on their respective bunks; they posed no threat to themseves or to anyone else.

29. Neither Mr. Hunt nor his cellmate had a weapon.

30. Neither Mr. Hunt nor his cellmate were engaged in the destruction of government property.

31. Mr. Hunt could hear correctional staff talking to each other outside the cell door, but none of them spoke to him or to his cellmate.

32. Each cell door has a hinged opening, called a "food slot," through which food trays are passed to the inmates inside the cell during meal times.

33. This opening is also where inmates' hands are cuffed by staff, after the inmate
extends both wrists through the opening.

34. The food slot is locked from the outside, and a correctional officer must use a
key to open it.

35. As Mr. Hunt sat on his bunk, he heard the food slot on the cell door being
unlocked.

36. He looked over to the cell door, saw the food slot open, and saw a clear shield
being held against the open food slot.

37. The shield disappeared quickly, and Mr. Hunt saw the barrel of a pepper ball gun
appear through the food slot.

38. A pepper ball gun is used to shoot a chemical weapon called a "pepper ball."

39. A "pepper ball" is a projectile filled with hot pepper powder (also known as
Oleoresin Capsicum, or "OC") which bursts on impact.

40. OC powder irritates the eyes, nose, throat and lungs and causes shortness of
breath.

41. The cell is a small, confined space.

42. Based on his location, Mr. Hunt was clearly visible to anyone looking through
the food slot.

43. Because of the height of the bunk he was sitting on, Mr. Hunt's face was level
with the food slot on the door.

44.  The barrel of the pepper ball gun was leveled directly at Mr. Hunt's face.

45.  Before Mr. Hunt could move or shift position, Defendant Seeba fired the pepper ball gun at him.

46.  No words were spoken, and no warning was given before the gun was fired.

47.  A pepper ball from the weapon hit Mr. Hunt in the right eye.

48.  Mr. Hunt felt a searing pain in his right eye.

49.  He reached up to his face and felt that it was wet.

50.  He immediately yelled out that he had been shot in the eye.

51.  Mr. Hunt moved to the floor and lay on his stomach, in excruciating pain, yelling out that he had been shot in the eye and screaming for staff to stop shooting.

52.  Defendant Seeba continued to shoot Mr. Hunt with pepper balls as he lay on the floor.

53.  Mr. Hunt felt a sharp pain in the back of his head where he was hit with another pepper ball.

54.  Mr. Hunt was hit numerous times, in different parts of his body, by the pepper balls.

55.  Mr. Hunt continued to scream that he had been shot in the eye and begged for staff to stop shooting.

56.  There was a short pause, and the gun barrel disappeared from the food slot.

57.  Then Defendant John Doe 1 threw a type of different weapon, similar to a

grenade, at Mr. Hunt through the food slot of the closed cell door.

58. One of the grenades exploded and cut Mr. Hunt's left arm as he lay on the floor.

59. The loud explosion damaged the hearing in his left ear.

60. Then Defendant Seeba resumed the pepper ball attack through the food slot.

61. Mr. Hunt then pulled his mattress on top of him while still lying on the floor to

    try to protect himself from the pepper ball attack.

62. Mr. Hunt pleaded for staff to stop shooting.

63. The pepper ball assault finally stopped.

64. Correctional staff ordered Mr. Hunt and his cellmate to strip naked and come to

    the locked cell door to be "cuffed up" through the food slot.

65. After Mr. Hunt and his cellmate were handcuffed with their hands behind their

    backs, they were ordered by staff to lie down on the cell floor.

66. Mr. Hunt suffered from asthma and had severe trouble breathing due to the OC

    powder in the cell which had been released from the pepper balls.

67. Mr. Hunt's cellmate yelled to correctional staff who were outside the cell door

    that Mr. Hunt was having trouble breathing and that he had asthma.

68. Correctional staff ignored this, however, and Mr. Hunt remained lying on the cell

    floor, naked, with his hands cuffed behind his back, in agony from his injuries and

    his problems breathing.

69. After approximately twenty minutes, correctional staff entered the cell and took

Mr. Hunt and his cellmate out of the cell and down the hallway.

70.  Despite his desperate pleas for medical attention, and despite the fact that his right eye was bleeding, correctional staff did not take Mr. Hunt to the medical department for treatment for his eye injury or other injuries or for his difficulty breathing.

71.  Instead, Mr. Hunt was taken to a restraints room on D Block and was put into hard restraints consisting of metal handcuffs attached to a chain around his waist and leg shackles.

72.  After several hours in the restraints room, Mr. Hunt was finally seen by medical staff, who evaluated his right eye, which was oozing blood and appeared to have a ruptured globe.

73.  Mr. Hunt was then taken to Geisinger Medical Center for belated emergency treatment for his right eye.

74.  Mr. Hunt's eye was determined by Geisinger medical staff to be inoperable.

75.  Approximately one week later, Mr. Hunt had a follow-up examination at Geisinger and could not see light with his right eye.

76.  The doctors told Mr. Hunt that he would not regain his vision in that eye.

77.  In July 2016, Mr. Hunt underwent surgery to remove his right eye.

78.  He was later fitted with a prosthetic eye; however, it did not fit properly and caused him intense pain.

9

79.  During the remaining time he spent at USP Lewisburg, Mr. Hunt suffered severe
     pain from the injuries he sustained during the incident.

80.  Mr. Hunt's pain kept him from sleeping at times and was exacerbated by the fact
     that the pain medication he was given was not effective.

81.  Since his release from custody, Mr. Hunt has suffered pain, frequent headaches
     and difficulty sleeping, caused by the pepper ball and grenade incident.

82.  He has had ongoing problems and pain in connection with ill-fitting prosthetic
     eyes.

83.  The mission of the BOP is to "protect society by confining offenders in the
     controlled environments of prisons and community-based facilities that are safe,
     humane and . . . appropriately secure . . ."[2]

84.  The BOP has both a statutory duty and a duty under the Constitution to protect
     inmates in its custody, including Mr. Hunt, from harm.

85.  BOP employees are required to follow BOP policies and procedures, which are
     contained in program statements, institution supplements, procedures manuals,
     and post orders, as well as in other documents created and maintained on the
     institutional, regional and national levels of the BOP.

86.  Correctional staff's use of force must be in accordance with training on the
     BOP's "Use of Force" policy and procedures.

87.  Under BOP policy, correctional staff are authorized to use force against an

_____
[2]  See https://www.bop.gov/about/agency/agency_pillars.jsp

inmate only as a last resort when all other reasonable efforts to gain control of the inmate have failed.

88.  According to BOP policy, when force is authorized, correctional officers are allowed to use only the amount of force necessary to gain control of an inmate, to protect and ensure the safety of inmates, staff or others, to prevent serious property damage, and to ensure security and good order.

89.  BOP employees are not permitted to use physical violence or intimidation towards inmates.

90.  Under BOP policy, "confrontation avoidance" is supposed to be attempted by staff as a first step to gain an inmate's compliance with staff instructions.

91.  This entails simply talking to the inmate and trying to convince him to comply with the order.

92.  Pepper spray is a chemical weapon which is a higher (more serious) level of force than "confrontation avoidance."

93.  Under BOP policy, staff are permitted to use pepper spray if an inmate is not compliant with orders and poses a threat of harm to staff or another inmate.

94.  Projectile chemical weapons, such as the pepper ball gun and grenades, are higher, more serious, levels of force than pepper spray.

95.  The use of chemical weapons, including the pepper ball gun and grenades, must be approved by the Warden.

96.  If the pepper ball gun is approved for use, BOP policy prohibits it to be aimed at

an inmate's head - this weapon is only permitted to be aimed at an inmate's

"center mass."

97.  Before using a chemical weapon on an inmate, correctional staff are required to

consult with medical staff to ensure that the inmate does not have any medical

conditions, such as asthma, which would make the use of chemical weapons

particularly dangerous or life threatening to the inmate.

98.  No confrontation avoidance techniques were used by staff in this incident.

99.  No one spoke to Mr. Hunt before shooting him with the pepper ball gun or

throwing grenades into the cell at him.

100.     Mr. Hunt heard no orders given by staff and believes that no orders were

given to him.

101.     However, even if an order had been given and Mr. Hunt had failed to

comply with that order, the use of force by staff in this incident was unjustified,

excessive, and in violation of BOP policy.

102.     Pepper spray was not used prior to the use of the pepper ball gun and the

grenades.  Instead, Defendants Seeba and John Doe 1 used these weapons as a

first, rather than a last, resort.

103.     Defendants Seeba and John Doe 1 used chemical weapons against Mr. Hunt

in reckless disregard of his health and safety.

104.     The use of the pepper ball gun and grenades against Mr. Hunt was not authorized under BOP policy, as he posed no threat of harm to himself or anyone else and was not doing anything that would justify this level of force.

105.     In blatant violation of BOP policy, when Defendant Seeba took his first shot at Mr. Hunt through the food slot, he intentionally aimed the pepper ball gun at Mr. Hunt's head.

106.     Later, Defendant Seeba again targeted Mr. Hunt's head - this time hitting him in the back of the head while Mr. Hunt was lying on the floor.

107.     Mr. Hunt's asthma was documented in his medical records.

108.     Staff did not consult or review Mr. Hunt's medical records in order to determine whether chemical weapons would pose an increased danger to Mr. Hunt, given his asthma.

109.     The use of force against Mr. Hunt in this incident constituted physical abuse and was in blatant violation of the BOP's use of force policy.

110.     Prior to this incident, Defendant Seeba was involved in numerous incidents of excessive use of force on inmates, some of which are documented in publicly available civil complaints filed by USP Lewisburg inmates.

111.     On April 17, 2011, Defendant Seeba is alleged to have refused to loosen excessively tight restraints on an inmate's arms, in violation of BOP policy, which resulted in serious physical injury to the inmate, necessitating surgery.

112.     On August 13, 2011, Defendant Seeba allegedly punched an inmate in the head while the inmate was in restraints.

113.     On May 25, 2013, Defendant Seeba is alleged to have authorized the use of OC spray on an unconscious inmate who was lying on the floor of his cell.

114.     On April 17, 2014, Defendant Seeba is alleged to have deployed pepper spray three times on an inmate while he was lying on his stomach and not posing any threat.

115.     On November 20, 2014, Defendant Seeba allegedly assaulted an SMU inmate by grabbing his arm while it was extended through the cell door's food slot for medical treatment and beating the inmate's arm with a baton.

116.     Defendant Seeba later allegedly punched this same inmate in the chest while the inmate was in restraints.

117.     In June 2012, an SMU inmate at USP Lewisburg was shot in the eye by a Lieutenant using a pepper ball gun while the inmate was lying on his stomach, compliant with staff's orders, in a recreation cage.

118.     Defendant Seeba was involved in this incident.

119.     Upon information and belief, that inmate also lost his eye.

120.     On information and belief, many more incidents of excessive force against inmates were committed by Defendant Seeba prior to the January 14, 2016 incident involving Mr. Hunt.

121.     On information and belief, many inmates have made complaints to BOP supervisory officials about Defendant Seeba's violence.

122.     Prior to the January 14, 2016 incident, Defendant Seeba's violent history was well known to Defendants Ebbert, Doe 2, and Doe 3, and to Defendant Seeba's other supervisors and co-workers.

123.     As supervisory officials, Defendants Ebbert, John Doe 2 and John Doe 3 were responsible for creating and implementing policy at USP Lewisburg.

124.     Defendants Ebbert, John Doe 2, and John Doe 3 were responsible, by virtue of their job duties and tasks, for inmate safety and security in the SMU at USP Lewisburg.

125.     They were responsible for ensuring that correctional staff used force, including deployment of chemical weapons, in accordance with BOP policies, procedures, and training.

126.     Each of these Defendants had a responsibility to ensure that correctional staff's practices at USP Lewisburg did not violate the constitutional rights of inmates.

127.     As Warden, Defendant Ebbert was responsible for the overall safety and security of all inmates in the SMU at USP Lewisburg.

128.     Defendant Ebbert was responsible for supervising, training, and disciplining correctional officers, including Lieutenants, at USP Lewisburg.

129.    Under BOP policy, the Warden must authorize the use of chemical weapons, including the pepper ball gun and grenades, before they are used by staff.

130.    Accordingly, on January 14, 2016, Defendant Ebbert knew that correctional staff were preparing to use the pepper ball gun and grenades against Mr. Hunt inside cell X-102 and that such use was unjustified.

131.    Despite this knowledge, Defendant Ebbert took no action to stop correctional staff from using the pepper ball gun and grenades on Mr. Hunt.

132.    Instead, Defendant Ebbert authorized correctional staff's use of the pepper ball gun and grenades on Mr. Hunt for no legitimate reason, in violation of BOP policy and Mr. Hunt's constitutional rights.

133.    Alternatively, correctional staff used the pepper ball gun and grenades on Mr. Hunt without first getting the necessary authorization from Defendant Ebbert, in violation of BOP policy.

134.    As Captain, John Doe 2 was responsible for custody and security at USP Lewisburg and for ensuring inmate safety in the SMU.

135.    John Doe 2 was responsible for supervising, disciplining, and training all custody staff within the SMU, including Defendants Seeba, John Doe 1, and John Doe 3.

136.    John Doe 2 was the direct supervisor of both Defendants Seeba and John Doe 1.

16

137.    As their direct supervisor, John Doe 2 was responsible for supervising and monitoring Defendants Seeba and John Doe 1 as they performed their duties.

138.    Under BOP policy, as Captain, John Doe 2 was supposed to be notified of and/ or involved in attempts to use "confrontation avoidance" techniques before physical force was used on an inmate.

139.    Under BOP policy, as Captain, John Doe 2 was required to know about planned uses of chemical weapons on inmates.

140.    Due to his responsibilities and job duties, on January 14, 2016, John Doe 2 knew or should have known that Mr. Hunt and his cellmate were inside their cell and that correctional staff were preparing to use the pepper ball gun and grenades on them and that such use was unjustified.

141.    John Doe 2 knew or should have known that confrontation avoidance techniques had not been attempted before correctional staff used the pepper ball gun and grenades,

142.    John Doe 2 knew that Defendant Seeba was involved in this situation on X block, and he knew Seeba's violent history and the threat of harm he posed to Mr. Hunt.

143.    Despite this knowledge, Defendant John Doe 2 took no action to stop Defendants Seeba and Doe 1 from using the pepper ball gun and grenades on Mr. Hunt.

144.    Instead, John Doe 2 permitted this unjustified and unconstitutional use of force and caused it to occur.

145.    As Operations Lieutenant, Defendant John Doe 3 was responsible for ensuring that the daily institutional schedule was followed for the shift he was working.

146.    John Doe 3's job duties and responsibilities also included maintaining communication with the Warden, the Captain, and all of the other lieutenants working during the shift.

147.    John Doe 3 was required to maintain records related to daily activities and events during his shift.

148.    As Operations Lieutenant, John Doe 3 was required to know about correctional staff's use of weapons on inmates during his shift.

149.    Correctional staff were required to notify John Doe 3 of any out of the ordinary situations or events in the housing units and elsewhere in the institution.

150.    Accordingly, at or around the same time he called for assistance on X Block on January 14, 2016, CO J. Murray notified John Doe 3 about the window of cell X-102 being covered with paper and the staff response to the situation.

151.    As a result, John Doe 3 knew that correctional staff were preparing to use projectile chemical weapons on Mr. Hunt and that such use was unjustified.

152.    John Doe 3 knew that Defendant Seeba was involved in the situation on X

Block, and he knew Seeba's violent history and the threat of harm he posed to Mr. Hunt.

153.    Despite this knowledge, Defendant John Doe 3 took no action to stop Defendants Seeba and Doe 1 from using the pepper ball gun and grenades on Mr. Hunt.

154.    Instead, John Doe 3 permitted this unjustified and unconstitutional use of force and caused it to occur.

155.    Defendants Ebbert, John Doe 2, and John Doe 3 (hereinafter "the Supervisory Defendants") along with other BOP employees at USP Lewisburg, had a duty to supervise and monitor Defendants Seeba and John Doe 1 in carrying out their duties as Lieutenants in the SMU.

156.    The Supervisory Defendants and other BOP employees had a duty to ensure that Defendants Seeba and John Doe 1 carried out their tasks in accordance with BOP policy and without violating the constitutional rights of the inmates.

157.    The Supervisory Defendants and other BOP employees had a duty to discipline Defendants Seeba and John Doe 1 when they committed misconduct, including when they used excessive force on inmates.

158.    They had a duty to monitor Defendants Seeba and John Doe 1's use of force (including the use of chemical weapons) against inmates to ensure that they only used appropriate force.

159.     They had a duty to retrain Defendant Seeba, in light of his past incidents using excessive force on inmates, to prevent him from continuing to use force and chemical weapons improperly against inmates.

160.     BOP employees, including the Supervisory Defendants, have a duty to protect inmates from violent assaults by correctional officers.

161.     The harm caused to Mr. Hunt by Defendant Seeba in this incident was foreseeable, as he had committed many prior assaults on inmates.

162.     Defendant Seeba's past assaults were well known to BOP employees, including the Supervisory Defendants, by virtue of their drafting, submitting, and/or reviewing various reports required under BOP policy, including incident reports, DHO reports, investigation reports, and After-Action Review reports.

163.     BOP employees, including the Supervisory Defendants, also knew about Defendant Seeba's past violence against inmates through verbal reports by Seeba's co-workers and other USP Lewisburg staff.

164.     Upon information and belief, other communication methods (including email, internal memoranda, and meetings) were also used to share information with BOP employees about Defendant Seeba's improper and excessive use of force on inmates.

165.     BOP employees, including the Supervisory Defendants, also knew about Defendant Seeba's past violent attacks on inmates because they received and

reviewed written and oral complaints and administrative remedies about his violence submitted by inmates and their friends and families.

166.    BOP employees, including the Supervisory Defendants, knew about these past incidents of violence from lawsuits filed against both Defendant Seeba and the United States by inmates and their families.

167.    BOP employees, including the Supervisory Defendants, knew that it was likely that Defendant Seeba would continue his pattern of using excessive force against inmates if they took no action to stop him.

168.    Despite this knowledge, no BOP employee, including any of the Supervisory Defendants, took any action to prevent Defendant Seeba from committing additional assaults.

169.    Despite an obvious need for discipline and/ or retraining, Defendant Seeba was not disciplined or retrained on the appropriate use of force by any BOP employees, including the Supervisory Defendants, although BOP employees and supervisors had a duty to administer corrective discipline to correctional officers who had engaged in misconduct related to the use of force.

170.    BOP employees, including the Supervisory Defendants, did not limit Defendant Seeba's access to chemical weapons, or other weapons, after any of his prior uses of excessive force, despite the fact that such a limitation on access was obviously necessary under BOP policy.

171.     At all relevant times, the actions and conduct of all defendants were carried

out in willful, reckless, and callous disregard of Mr. Hunt's rights under federal

and state law.

172.     As a result of the conduct of all defendants, Mr. Hunt suffered extraordinary

damages, including permanent debilitating injury in the loss of his right eye,

extreme physical pain and suffering, ongoing severe headaches, injury to his left

ear, injury to his left arm and other parts of his body, problems and pain associated

with prosthetic eyes, and numerous scars from the impact of the pepper balls and

grenades on his body.

173.     Additionally, Mr. Hunt has suffered substantial mental and emotional

injuries, which may be permanent and which have resulted in physical symptoms

including emotional trauma, anger, anxiety, difficulty sleeping, and depression.

174.     As there will be an ongoing need for medical care and treatment Mr. Hunt

will likely also incur economic injury as a result of defendants' conduct.

## V.     CAUSES OF ACTION

### COUNT 1

Federal Tort Claims Act: Negligence
(Against the United States of America)

175.     Mr. Hunt realleges and incorporates by reference the allegations of

paragraphs 1-174 above.

176.     The United States owed a duty to Mr. Hunt and breached its duty, which

breach was a direct and proximate cause and a substantial factor in bringing about Mr. Hunt's injuries and damages outlined above.

177.     In particular, through the conduct of its employees, Defendant United States of America violated its duty to Mr. Hunt by:

> (a) causing chemical weapons to be used against Mr. Hunt in a small, confined cell in violation of BOP policy and training and in reckless disregard of Mr. Hunt's safety and well being;

> (b) causing chemical weapons to be used against Mr. Hunt without justification and in an unsafe and inappropriate manner;

> (c ) ignoring Mr. Hunt's repeated complaints of pain and injury while he was inside the cell and delaying his access to medical care for his injuries;

> (d ) failing to ensure that the BOP's policies and procedures governing the use of force and the use of chemical weapons on inmates are followed by correctional staff;

178.     The harm suffered by Mr. Hunt as a result of Defendant's breach of its duty was foreseeable.

179.     The above-described acts and omissions constitute the tort of negligence under the laws of the Commonwealth of Pennsylvania.

180.     Under the Federal Tort Claims Act, defendant United States of America is liable for these actions.

## COUNT 2

### Federal Tort Claims Act: Assault and Battery
#### (against the United States of America)

181.   Mr. Hunt realleges and incorporates by reference the allegations of paragraphs 1-174 above.

182.   The conduct of BOP employees Seeba and John Doe 1, as described above, in shooting Mr. Hunt with pepper balls and hitting him with grenades, intended to place him in imminent apprehension of harmful or offensive contact.

183.   Such actions caused Mr. Hunt imminent apprehension and, further, caused him to suffer harmful or offensive contacts.

184.   There was no justification for these actions.

185.   These actions constitute the torts of assault and battery under the laws of the Commonwealth of Pennsylvania.

186.   Under the Federal Tort Claims Act, defendant United States of America is liable for these actions.

## COUNT 3

### Federal Tort Claims Act: Negligent Supervision and Retention
#### (against the United States of America)

187.   Mr. Hunt realleges and incorporates by reference the allegations of paragraphs 1-174 above.

188.   Defendant the United States of America is responsible for the oversight of

its employees, BOP correctional officers and supervisory staff ("BOP officials"),

at the United States Penitentiary at Lewisburg.

189.   BOP officials have a duty to protect inmates from the excessive use of force

by staff.

190.   BOP officials have a duty to monitor, supervise, train, and discipline

correctional officers in order to ensure that they properly perform their duties so

that inmates are housed in a safe manner and inmates' constitutional rights are not

violated.

191.   BOP officials knew that Defendant Seeba had been responsible for

numerous incidents of excessive force against inmates prior to January 14, 2016.

192.   BOP officials breached the duty of care they owed to Mr. Hunt by failing to

monitor, discipline, and retrain Defendant Seeba after those prior incidents of

excessive force.

193.   By their acts and omissions described above, BOP officials breached the

duty of care they owed to Mr. Hunt by failing to prevent Defendant Seeba from

using the pepper ball gun on Mr. Hunt on January 14, 2016.

194.   As a result of BOP officials' breach of the duty they owed Mr. Hunt, he

suffered serious and permanent personal injuries, pain and suffering, loss of life's

pleasures, and emotional distress.

195.   BOP officials' acts and omissions were a direct and proximate cause and a

substantial factor in bringing about Mr. Hunt's damages.

196.   The acts and omissions of BOP officials as described above constitute the torts of negligent supervision and retention under the laws of the Commonwealth of Pennsylvania.

197.   Under the Federal Tort Claims Act, defendant United States of America is liable for these actions.

## COUNT 4

Federal Tort Claims Act: Intentional Infliction of Emotional Distress
(against the United States of America)

198.   Mr. Hunt realleges and incorporates by reference the allegations of paragraphs 1-174 above.

199.   The conduct of BOP employees in assaulting Mr. Hunt with the pepper ball gun and grenades while he was sitting in his cell and posing no threat to anyone, and in refusing to cease the assault despite Mr. Hunt's desperate pleas for them to stop, and in intentionally delaying Mr. Hunt necessary medical care after the assault although his eye was bleeding and he was suffering from other injuries caused by the weapons attack was extreme and outrageous.

200.   BOP employees acted intentionally or in deliberate disregard of Mr. Hunt's emotional distress; and, as a direct and proximate result, he suffered severe emotional distress which manifests itself in physical symptoms.

201.   BOP employees' actions as described above constitute the tort of intentional

infliction of emotional distress under the laws of the Commonwealth of

Pennsylvania.

202.   Under the Federal Tort Claims Act, Defendant United States of America is

liable for these actions

## COUNT 5

### <u>Bivens</u> Claim: Eighth Amendment
(against Defendant Seeba)

203.   Mr. Hunt realleges and incorporates by reference the allegations of

paragraphs 1-174 above.

204.   Defendant Seeba's conduct as described above constitutes the infliction of

cruel and unusual punishment, in violation of Mr. Hunt's Eighth Amendment

rights under the United States Constitution.

205.   Defendant Seeba intentionally and maliciously used force on Mr. Hunt

solely to cause him pain and harm and not for any legitimate penological purpose.

206.   As a direct and proximate result of Defendant Seeba's acts and omissions,

Mr. Hunt suffered injuries and damages as described above.

## COUNT 6

### <u>Bivens</u> Claim:  Eighth Amendment
(against Defendant John Doe 1)

207.   Mr. Hunt realleges and incorporates by reference the allegations of

paragraphs 1-174 above.

208.   Defendant John Doe 1's conduct as described above constitutes the inflction of cruel and unusual punishment, in violation of Mr. Hunt's Eighth Amendment rights under the United States Constitution.

209.   John Doe 1 intentionally and maliciously used force on Mr. Hunt solely to cause him pain and harm and not for any legitimate penological purpose.

210.   As a direct and proximate result of Defendant John Doe 1's acts and omissions, Mr. Hunt suffered injuries and damages as described above.

### COUNT 7

Bivens Claim:  Eighth Amendment – Supervisory Liability
(against Defendants Ebbert, John Doe 2, and John Doe 3)

211.   Mr. Hunt realleges and incorporates by reference the allegations of paragraphs 1-174 above.

212.   Defendants Ebbert, John Doe 2, and John Doe 3, by their acts and omissions described above, failed to enforce the BOP's use of force policy and instead permitted Defendants Seeba and John Doe 1 to use unjustified force and violence against Mr. Hunt, in violation of his constitutional right to be free from cruel and unusual punishment.

213.   Defendants Ebbert, John Doe 2, and John Doe 3, by their acts and omissions described above, failed to supervise, monitor, discipline, and retrain Defendants Seeba and John Doe 1 with regard to use of force.

214.   Through their acts and omissions described above, Defendants Ebbert, John Doe 2, and John Doe 3, were directly and personally responsible for causing the harm suffered by Mr. Hunt and for violating his Eighth Amendment rights.

215.   As a direct and proximate result of Defendants Ebbert, John Doe 2, and John Doe 3's acts and omissions, Mr. Hunt suffered injuries and damages as described above.

## VI.   RELIEF

WHEREFORE, Plaintiff James Hunt respectfully asks this Honorable Court to grant him the following relief:

1.   Compensatory damages as to all Counts;

2.   Punitive damages as to Counts 5 through 7;

3.   Declaratory relief as to all Counts;

4.   Reasonable attorneys' fees and costs; and,

5.   Such other further relief as this Court deems just and appropriate.

Respectfully submitted,

*/s/ Jennifer J. Tobin*
Jennifer J. Tobin
PA Bar No. 202047
Tobin Law Office, LLC
702 N. 3rd Street, # 71
Philadelphia, PA 19123
Tel. 267-258-8918/ Fax: 267-428-6493
e: jtobin0913@gmail.com

Date: January 11, 2018                    Counsel for Plaintiff James Hunt